Mark V. SHOEN, Plaintiff–Appellee,

v.

Leonard Samuel SHOEN,
et al., Defendants.

Edward J. SHOEN, Plaintiff–Appellee,

v.

Leonard Samuel SHOEN,
et al., Defendants.

Ronald J. Watkins, Appellant.

No. 92–16573.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 16, 1992.

Decided Sept. 27, 1993.

Gloria C. Phares, Weil, Gotshal & Manges, New York City, and Guy Bradley Price, Phoenix, AZ, for appellant Watkins.

Richard M. Amoroso, Cohen and Cotton, Phoenix, AZ, for appellee Mark Shoen.

Russell Piccoli, Phoenix, AZ, for appellee Edward Shoen.

Before NORRIS, BEEZER, and KLEINFELD, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This appeal presents the question whether an investigative author, at work on a forthcoming book, may be compelled to testify and produce notes and tape recordings of interviews he conducted with a source who happens to be a defendant in a defamation action. We hold, under the circumstances of this case, that he may not.

## I

Appellant Ronald Watkins is an investigative author of books on topical and controversial subjects. He became involved in this defamation action because of his work on a forthcoming non-fiction book about a long and bitter family feud over control of the highly successful U–Haul Company—a feud pitting the patriarch of the family and founder of U–Haul, Leonard Shoen, against two of his sons, Mark and Edward Shoen. In the midst of these family quarrels, Eva Berg Shoen, the wife of Leonard's eldest son Sam, was found brutally murdered in her family's log cabin in Telluride, Colorado. The murder remains unsolved.

Following Eva's murder, Watkins, the author of two previous investigative books on issues of current interest,[1] secured a contract with a major publisher to write a book about the Shoen family, its battles over control of U–Haul, and the murder of Eva Shoen. The book, entitled *Birthright*, is slated for publication in late 1993.

Leonard Shoen agreed to cooperate with Watkins by providing source material for the book in exchange for a share of future royalties. Watkins then conducted a number of research interviews with Leonard, some of which were tape recorded by Watkins. Leonard's cooperation as a source for Watkins' book was not kept secret; nor does it appear that Leonard had any expectation that the information he provided Watkins would remain confidential.

Meanwhile, Mark and Edward Shoen, the two sons at war with Leonard over U–Haul, brought this defamation against their father, alleging that he made public statements linking them to the murder of their sister-in-law Eva.[2] Mark and Edward do not claim that

---

1. Ronald Watkins is the author of *High Crimes and Misdemeanors* (1990), an account of the impeachment of former Arizona governor Evan Mecham, and *Evil Intentions* (1992), an account of the recent murder of Suzanne Rossetti.

2. Among the statements plaintiffs allege to be defamatory are the following examples:
 (1) "In a telephone interview from his home in Las Vegas, the eldest Shoen said he believes his two sons are mentally ill and that he suspects they are indirectly connected to the killing [of Eva Shoen]." (Published by the Associ-

their father made any of his allegedly defamatory statements to Watkins. However, as part of their pretrial discovery, plaintiffs served Watkins with a subpoena duces tecum ordering him to appear at a deposition, testify, and produce any notes, documents, electronic recordings, or any other records in his possession "relating to the death of Eva Berg Shoen." After failing to obtain a protective order under Arizona's statutory "press shield" law,[3] Watkins appeared at the scheduled deposition but refused to produce any documents or recordings or to answer any questions concerning the substance of his interviews with Leonard Shoen. When plaintiffs filed a motion to compel production of documents and testimony, Watkins responded with a motion to quash on the ground that compulsory disclosure of his interviews with Leonard Shoen would violate his qualified First Amendment privilege as a journalist.

The district court denied Watkins' motion to quash and granted the plaintiffs' motion to compel, ruling that Watkins, as an investigative author, had standing to invoke the journalist's privilege, but that in the particular circumstances of this case, the qualified privilege must yield to the plaintiffs' litigation needs. The court ordered Watkins to testify about all the "communications by [Leonard] Shoen to Mr. Watkins and [to produce] such materials as may memorialize those communications." ER at 159.

The scope of the court's order later became a matter of dispute. In a telephone conference, the court stated that the plaintiffs were entitled to "each and every method, mode, scrap of paper, computer disk, note, recollection, shred of evidence that would evidence" Leonard Shoen's communications to Watkins on matters concerning "the murder, the family feud, and any statements made as to ... the plaintiffs [Mark and Edward Shoen] themselves." ER at 168.

When Watkins refused to appear at the second deposition, the district court held him in contempt. Watkins now appeals the contempt order on the ground that the discovery order compelling him to divulge all that Leonard Shoen told him for use in his book violates his qualified First Amendment privilege as a journalist. We agree and vacate the order holding Watkins in contempt.[4]

## II

The basic facts underlying the court's discovery order are not in dispute. The analy-

ated Press Wire Service on or after August 23, 1990.)

(2) "[The murder of Eva Shoen was an] 'assassination'. [Leonard Shoen] suggested to authorities that the killing might be related to a long-running family feud over control of the company, which has close to $1 billion in annual sales." (Published in the *Los Angeles Times* on September 4, 1990.)

(3) *Leonard Shoen*: "I don't know this for a fact, but I am convinced that these sons, either one or both of them, directly or indirectly are responsible for this.... My son, Sam, was to be hit. He was to be removed from the picture, and I think these two young men, my young sons, either programmed other people to believe this or else had done it themselves...." (Published on the television program "Hard Copy" on October 2, 1990.)

(4) *Questioner*: "Do you think that your sons truly could have hired someone to kill their brother and, thus, his wife?"

*Leonard Shoen*: "Yes, I do, I believe that they could have by hiring the killer themselves or by indirectly creating an environment where someone around them would think that the thing to do is to get rid of Sam for them and

they will do him a big favor." (Published by KTVK–TV on November 2, 1990.)

(5) "[Leonard Shoen] has continued to push two theories of the crime: one that suggests that [Edward] or Mark hired the killers, and one which someone allied with the brothers and U–Haul management decided to eliminate Sam.... Either way, he says, 'I believe one or both of these sons are indirectly responsible for Eva's death....'" (Published in the *Los Angeles Times* on February 17, 1991.)

Edward J. Shoen's Complaint for Defamation at 2–9.

3. The district court denied Watkins' motion for a protective order under Arizona's "press shield" law, Ariz.Rev.Stat.Ann. §§ 12–2214, 12–2237, because an intervening decision by the Arizona Court of Appeals had construed the application of the shield law to exclude investigative book authors such as Watkins. *See Matera v. Superior Court,* 170 Ariz. 446, 825 P.2d 971 (Ariz.Ct.App. 1992).

4. Our jurisdiction to review the contempt order rests on 28 U.S.C. § 1291. *See Newton v. National Broadcasting Co. Inc.,* 726 F.2d 591, 592 (9th Cir.1984).

sis begins with two threshold legal questions: First, does an investigative book author have standing to invoke the journalist's privilege? Second, does the journalist's privilege protect information and materials obtained without a guarantee of confidentiality? Because these are pure questions of law, our review is *de novo.* *See United States v. McConney,* 728 F .2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Because we answer both these threshold legal questions in the affirmative and hold that the qualified privilege applies in this case, we must decide a third question: Have the plaintiffs demonstrated a need for Watkins' information that is sufficient to overcome the interests favoring non-disclosure? Because this question requires us to consider legal principles in the mix of fact and law, and to exercise judgment in resolving conflicting legal values, we decide this question *de novo.* *Id.* at 1202.

### III

■■■■ We start with the premise that pretrial discovery is ordinarily "accorded a broad and liberal treatment." *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). If no claim of privilege applies, a non-party can be compelled to produce evidence regarding any matter "relevant to the subject matter involved in the pending action" or "reasonably calculated to lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). This broad right of discovery is based on the general principle that litigants have a right to "every man's evidence," *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884

(1950), and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth.

■■■■ However, when facts acquired by a journalist in the course of gathering the news become the target of discovery, a qualified privilege against compelled disclosure comes into play. In *Farr v. Pitchess,* 522 F.2d 464, 467–68 (9th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), we interpreted *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), as establishing such a qualified privilege for journalists. Eight of the other nine circuits that have decided the question read *Branzburg* the same way.[5]

Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest " 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.' " *Herbert v. Lando,* 441 U.S. 153, 183, 99 S.Ct. 1635, 1652, 60 L.Ed.2d 115 (1979) (Brennan, J., dissenting) (quoting *McCormick on Evidence* 152 (2d ed. 1972)).

We held in *Farr* that the journalist's privilege recognized in *Branzburg* was a "partial First Amendment shield" that protects journalists against compelled disclosure in all judicial proceedings, civil and criminal alike. *Farr,* 522 F.2d at 467. Nevertheless, we stressed that the privilege is qualified, not absolute, and held that the process of deciding whether the privilege is overcome re-

---

**5.** The First, Second, Third, Fourth, Fifth, Eighth, Tenth, and District of Columbia circuits have all interpreted *Branzburg* as establishing a qualified privilege for journalists to resist compelled discovery. *See Bruno & Stillman, Inc. v. Globe Newspaper Corp.,* 633 F.2d 583, 595–96 (1st Cir. 1980); *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139 (4th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *Miller v. Transamerican Press,* 621 F.2d 721, 725

(5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Cervantes v. Time, Inc.,* 464 F.2d 986, 992–93 & n. 9 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 436–37 (10th Cir. 1977); *Zerilli v. Smith,* 656 F.2d 705, 714 (D.C.Cir.1981).

Only the Sixth Circuit reads *Branzburg* as denying a qualified First Amendment privilege to journalists. *See In re Grand Jury Proceedings,* 810 F.2d 580, 584–85 (6th Cir.1987). The Seventh and Eleventh Circuits have yet to decide the question.

quires that "the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest." *Id.* at 468.

## IV

Before we weigh the competing interests at stake in this case, we must first decide two threshold legal questions of first impression in this circuit: whether Watkins, as an investigative book author, has standing to invoke the journalist's privilege, and whether the privilege operates to shield information provided by a source without an expectation of confidentiality.

### A

■ Plaintiffs argued below that Watkins has no standing to invoke the journalist's privilege because book authors are not members of the institutionalized print or broadcast media.[6] We disagree.

So far, the only circuit that has addressed this question is the Second, which did so in *von Bulow v. von Bulow,* 811 F.2d 136 (2nd Cir.), *cert denied* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). In *von Bulow,* the Second Circuit held that the journalist's privilege was not limited to reporters employed in the traditional print or broadcast media. The purpose of the journalist's privilege, it reasoned, was not solely to protect newspaper or television reporters, but to protect the activity of "investigative reporting" more generally. *Id.* at 142–43. Thus, the court said, it makes no difference whether "[t]he intended manner of dissemination [was] by newspaper, magazine, book, public or private broadcast medium, [or] handbill" because " '[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' " *Id.* at 144 (quoting *Lovell v. Grif-*

*fin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938)).

■ We find the Second Circuit's reasoning in *von Bulow* persuasive. The journalist's privilege is designed to protect investigative reporting, regardless of the medium used to report the news to the public. Investigative book authors, like more conventional reporters, have historically played a vital role in bringing to light "newsworthy" facts on topical and controversial matters of great public importance. At the turn of the century, for example, muckraking authors such as Lincoln Steffens and Upton Sinclair exposed widespread corruption and abuse in American life.[7] More recently, social critics such as Rachel Carson, Ralph Nader, Jessica Mitford, and others have written books that have made significant contributions to the public discourse on major issues confronting the American people.[8] Indeed, it would be unthinkable to have a rule that an investigative journalist, such as Bob Woodward, would be protected by the privilege in his capacity as a newspaper reporter writing about Watergate, but not as the author of a book on the same topic.

In sum, we see no principled basis for denying the protection of the journalist's privilege to investigative book authors while granting it to more traditional print and broadcast journalists. What makes journalism journalism is not its format but its content.

■ Hence, the critical question for deciding whether a person may invoke the journalist's privilege is whether she is gathering news for dissemination to the public. The test, as the Second Circuit put it so nicely in *von Bulow,* is whether the person seeking to invoke the privilege had "the intent to use material—sought, gathered or received—to disseminate information to the public and [whether] such intent existed at the inception of the newsgathering process." 811 F.2d at

---

**6.** The district court held that, as an author, Watkins was entitled to invoke the journalist's privilege. Plaintiffs do not challenge this ruling on appeal. We nevertheless reach the issue here because it is essential to our reasoning in deciding this appeal.

**7.** *See* Lincoln Steffens, *The Shame of the Cities* (1904); Upton Sinclair, *The Jungle* (1906).

**8.** *See* Rachel Carson, *The Silent Spring* (1962); Ralph Nader, *Unsafe at any Speed* (1965); Jessica Mitford, *The American Way of Death* (1963) and *The American Way of Birth* (1992).

144. If both conditions are satisfied, then the privilege may be invoked.[9]

Ronald Watkins easily passes this test. It is uncontroverted that he undertook his present research with the intention of writing a book about the Shoen family, its longstanding feud over control of the U–Haul trucking empire, and the murder of Eva Shoen. Accordingly, Watkins has standing to invoke the journalist's privilege.

## B

■ We now turn to the question whether Watkins is barred from invoking the journalist's privilege to shield the information he obtained from Leonard Shoen because the information was not obtained under a promise of confidentiality.[10]

All three circuits that have addressed this question have held that the privilege protects a journalist's resource materials regardless of whether these materials contain confidential information.

The Third Circuit was the first to address the confidentiality question. *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980), involved an attempt by a criminal defendant to obtain reporters' notes and film "out-takes" (videotaped material not broadcast) collected by CBS reporters in preparation for a story broadcast on "60 Minutes." Even though none of CBS' information was obtained in confidence, the Third Circuit held that the journalist's privilege shielded CBS' unpublished resource materials. The court reasoned that,

[t]he compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes. Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information that is the foundation for the privilege.

*Id.* at 147 (citations omitted).

In *von Bulow*, the Second Circuit also held that the privilege may be invoked whether or not the information was obtained in confidence. In outlining the general principles underlying the journalist's privilege, the Second Circuit said that "the relationship between the journalist and his source may be confidential or non-confidential for purposes of the privilege" and "unpublished resource material likewise may be protected." 811 F.2d at 142.

Finally, and most recently, the First Circuit addressed the question in *United States v. La Rouche Campaign*, 841 F.2d 1176 (1st Cir.1988), which involved an attempt by a criminal defendant to obtain film out-takes from an interview by NBC reporters with a prospective key witness for the prosecution. In appraising the First Amendment interests at stake, the court considered four different justifications presented by NBC for extending protection to non-confidential information:

The ... four interests named are the threat of administrative and judicial intrusion into the newsgathering and editorial process; the disadvantage of a journalist

---

9. We do not decide whether the journalist's privilege may be invoked by a person writing a book about a recent historical figure, such as Harry Truman or Albert Einstein, where the intent, arguably, is not the dissemination of "news," but the writing of history. We do not rule out the possibility but simply leave the question for another day.

10. Watkins states, generally, that he had confidential relationships with sources in the course of writing this book. But Watkins does not say that Leonard Shoen had any expectation that the information he provided to Watkins would remain confidential.

Indeed, it appears from the record that Leonard expected the information he provided to Watkins to be disclosed publicly in Watkins' forthcoming book. Soon after Leonard agreed to be a

source for Watkins' book, Watkins wrote a letter to the public relations manager of U–Haul, stating that Leonard was "extending his complete cooperation [on the book] *without preconditions.*" ER at 28 (emphasis added).

It may be the case that Leonard expected the information and its source to remain secret until the book was published. But an expectation of delayed disclosure is not the same as an expectation of confidentiality.

The critical question is whether Leonard reasonably expected to be protected by a cloak of confidentiality even after publication. Because Watkins makes no claim that Leonard had such an expectation, our analysis proceeds on the assumption that no element of confidentiality is at stake.

appearing to be an investigative arm of the judicial system or a research tool of government or of a private party; the disincentive to compile and preserve non-broadcast material; and the burden on journalists' time and resources in responding to subpoenas.

*Id.* at 1182 (internal quotations omitted). The court agreed that there was merit to these asserted First Amendment interests.[11] It noted a "lurking and subtle threat" to the vitality of a free press if disclosure of non-confidential information "becomes routine and casually, if not cavalierly, compelled." *Id.* The court continued,

> To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. In addition, frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees but measurably increase expenditures for legal fees.

*Id.* The First Circuit held that, because these were legitimate First Amendment interests, they must be balanced against the defendant's interests before disclosure may be ordered.

As two distinguished commentators have written, elaborating on a point touched upon by the First Circuit in *La Rouche*, the compelled disclosure of non-confidential information harms the press' ability to gather information by damaging confidential sources' trust in the press' capacity to keep secrets and, in a broader sense, by converting the press in the public's mind into an investigative arm of prosecutors and the courts. It is their independent status that often enables reporters to gain access, without a pledge of confidentiality, to meetings or places where a policeman or a politician would not be welcome. If perceived as an adjunct of the police or of the courts, journalists might well be shunned by persons who might otherwise give them information without a promise of confidentiality, barred from meetings which they would otherwise be free to attend and to describe, or even physically harassed if, for example, observed taking notes or photographs at a public rally.

Duane D. Morse & John W. Zucker, *The Journalist's Privilege* in *Testimonial Privileges* 474–75 (Scott N. Stone & Ronald S. Liebman eds., 1983).

We find this body of circuit case law and scholarly authority so persuasive that we think it unnecessary to discuss the question further.[12] Accordingly, we hold that the journalist's privilege applies to a journalist's resource materials even in the absence of the element of confidentiality. We add, however, that the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure. As the Third Circuit said in *Cuthbertson*, "the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing

---

**11.** The court in *La Rouche* did not use the term journalist's privilege. Rather, it spoke in terms of weighing the First Amendment interests before compelling disclosure of a journalist's sources. Nevertheless, the court recognized that the difference in terminology was simply one of semantics:

> "Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a 'conditional', or 'limited' privilege is, we think, largely a question of semantics. The important point for purposes of the present appeal is that courts faced with enforcing requests for the discovery of materials used in

the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights."

841 F.2d at 1181 (quoting *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595 (1st Cir.1980)).

**12.** *See also Miller v. Mecklenburg County*, 602 F.Supp. 675, 678 (W.D.N.C.1985) (noting that the "majority view [among the district courts] clearly is that non-confidential material received by a reporter from an investigative source is protected by the qualified privilege").

production in a particular case." 630 F.2d at 147.

Having decided that Watkins has properly invoked the privilege on the facts of this case, we now must determine whether plaintiffs' need for the information outweighs the First Amendment interests at stake.[13]

## V

 Once the privilege is properly invoked, the burden shifts to the requesting party to demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege. At a minimum, this requires a showing that the information sought is not obtainable from another source. *See In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *United States v. Criden*, 633 F.2d 346, 358–59 (3d Cir.1980); *Silkwood, supra* at 438. In other words, before disclosure may be ordered, the requesting party must demonstrate that she has exhausted all reasonable alternative means for obtaining the information. *Zerilli, supra* at 713.

 We hold that plaintiffs have not satisfied this threshold requirement because they failed to take Leonard Shoen's deposition before trying to penetrate the journalist's shield that protects Watkins' source materials.[14]

Plaintiffs do not dispute that their father is an obvious alternative source for discovering what he said to Watkins in their conversations. Rather, plaintiffs argue that they

have exhausted Leonard as a source by serving him with written interrogatories which produced uninformative answers. Plaintiffs' written interrogatories asked their defendant father the following question:

> *Interrogatory No. 7*: Describe in detail every conversation had by you with Ronald Watkins, setting forth, separately as to each conversation: (a) The date of the conversation; (b) The place of the conversation; (c) All persons present for the conversation; and (d) The exact content of the conversation.

In response, plaintiffs received the following answer:

> Defendant Shoen did not personally maintain records of meetings or conversations with novelist Ronald Watkins, and cannot specifically recall each time he might have conversed with Mr. Watkins by telephone or in person. Defendant will, nevertheless, provide such information as he can presently recall.

Then, after describing generally the dates and locations of his conversations with Watkins, approximately how many took place in person and over the phone, and indicating that only Watkins and he were present during these conversations, Shoen stated the following:

> (d) Defendant cannot recall the *specific content* of the various meetings or conversations with Mr. Watkins. The interviews generally, however, provided background information to Mr. Watkins about myself,

---

**13.** We respect the efforts made in the concurring opinion to reverse the discovery and contempt orders on the non-constitutional ground that the district court abused its discretion under Fed. R.Civ.P. 26(b). However, this effort to avoid Watkins' claim of privilege under the First Amendment falls short. Absent the claim of privilege, the district court would have been well within its discretion in ordering Watkins to answer the interrogatories and the deposition questions about his conversations with defendant Leonard Shoen relating to the murder of Eva Shoen. Those conversations are plainly "relevant to the subject matter involved in the pending action," Fed.R.Civ.P. 26(b)(1), and there is nothing in the discovery rules that requires a party to depose an adverse party before a third party witness. Indeed, Watkins does not challenge the discovery and contempt orders as an

abuse of discretion under Rule 26; rather he challenges the orders solely on the legal ground of the journalist's qualified First Amendment privilege.

**14.** Because we hold that plaintiffs have not satisfied the exhaustion requirement, we express no opinion on whether plaintiffs have made a sufficient showing on the other questions considered in the balance—i.e., whether the information sought is relevant, material, and non-cumulative, and whether it is crucial to the maintenance of plaintiffs' legal claims. *See generally In re Petroleum Prods., supra* at 7; *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 89 F.R.D. 489, 494 (C.D.Cal.1981) (and cases cited therein).

about the founding and development of U-Haul and about the Shoen family itself. Appellee's Joint Supplemental Excerpts of Record at 206 (emphasis added).

At that point, plaintiffs abandoned their attempt to discover from Leonard Shoen what he told Watkins. They argue that it would be futile to take their father's deposition because his answers to the interrogatories establish that he has no recollection of the content of the conversations. Thus they rely exclusively on Interrogatory No. 7 to satisfy the requirement of exhausting all reasonable alternatives before compelling Watkins to disclose his source materials.

Written interrogatories are rarely, if ever, an adequate substitute for a deposition when the goal is discovery of a witness' recollection of conversations. Leonard Shoen's answer to Interrogatory No. 7 illustrates this common sense proposition. His answer, such as it is, cries out for follow-up questions. Although he claims to be unable to recall the "specific content" of his conversations with Watkins, he admits to remembering that such conversations did take place, where and when they took place, and whether in person or by telephone. This admission, combined with the implied admission that he remembers at least something about the content of the conversations, if not their "specific content," provides plaintiffs' lawyers with material they can exploit in asking follow-up questions designed to test and refresh his recollection of the details of the conversations. Follow-up questions such as these are virtually impossible in interrogatories.

Only by examining a witness live can a lawyer use the skills of his trade to plumb the depths of a witness' recollection, using to advantage not only what a witness may have admitted in answering interrogatories, but also any new tidbits that usually come out in the course of answering carefully framed and pin-pointed deposition questions. Written interrogatories are not designed for that purpose; pointed questions at deposition are the only effective way to discover facts bottled up in a witness' recollection, particularly when the witness is as hostile as Leonard Shoen is sure to be as a defendant sued by two sons for allegedly linking them to the murder of

their sister-in-law. Indeed, the allegations in this case, revolving around the murder of Eva Shoen, are so dramatic that it may be impossible for Leonard Shoen to testify, if asked, that he has no recollection of discussing the murder in conversations with an author writing a book about the murder, especially when he had a contract to cooperate with that author.

In sum, plaintiffs' reliance on Leonard Shoen's interrogatory answer that he cannot recall the "specific content" of his conversation fails as an excuse for not taking his deposition before turning their discovery weapons against Watkins. Nor can they avoid the exhaustion requirement by speculating, without supporting evidence, that Leonard Shoen's advanced age may have dulled his faculties. *Cf. Zerilli, supra* at 715 (The moving parties "cannot escape their obligation to exhaust alternative sources simply because they feared that deposing [numerous] employees would be time-consuming, costly, and unproductive."). As the court noted in *Carey v. Hume,* 492 F.2d 631 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974), compelled disclosure from a journalist must be a "last resort after pursuit of other opportunities has failed." *Id.* at 639.

Plaintiffs' failure to depose Leonard Shoen before pursuing Watkins highlights an important distinction between this case and *Farr.* In *Farr,* a trial judge sought disclosure from a third-party journalist to determine which of the attorneys in a celebrated murder case had violated a gag order by leaking a witness statement to the journalist. The journalist was ordered to disclose his source only after the court held a series of hearings, at which each of the attorneys still alive denied, under oath, that he was the source of the leak. At that point, the only untapped source for the wrongdoer's identity was the journalist. Here, in contrast, by failing to depose Leonard Shoen, plaintiffs have failed to exhaust the "most patently available other source." *Riley v. City of Chester,* 612 F.2d 708, 717 (3d Cir.1979).

In sum, it is too early in the discovery process for Watkins' journalist privilege to yield. In so holding, we do not say that

plaintiffs will never be able to overcome the presumption in favor of the privilege; we say only that they have failed to provide a sufficiently compelling reason to do so at this stage of the litigation.

REVERSED AND REMANDED.

KLEINFELD, Circuit Judge, concurring:

I concur in the result reached by the majority, that the subpoena duces tecum on Mr. Watkins, should have been quashed. I would reach this result on a nonconstitutional ground, Federal Rule of Civil Procedure 26(b).

We traditionally avoid deciding cases on constitutional grounds where nonconstitutional grounds lead to the same conclusion. "Fundamental principles of judicial restraint require federal courts to consider nonconstitutional grounds for decision prior to reaching constitutional questions." *Erickson v. United States*, 976 F.2d 1299, 1301 (9th Cir. 1992) (citing *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985)). A constitutional ground for the decision removes the matters decided from democratic control. State legislatures and Congress have frequently considered various testimonial privileges over the last two or three decades. The legislature and governor of Arizona have promulgated a statute, A.R.S. § 12–2237,[1] carefully delineating the scope of reporters' testimonial privileges in a way which does not protect Watkins. *See Matera v. Superior Court*, 825 P.2d 971 (Ct.App. 1992);[2] *see also*, A.R.S. § 12–2214 (governing subpoena of media witnesses). The decision to treat something as an issue of constitutional law is an appropriation of power from the democratic organs of government to the judiciary. That is our duty in some cases, but not where the same result is properly reached on a ground which leaves the matter open for revision if the elected organs of government conclude that our views are mistaken.

The controlling decision on journalists' privilege in this circuit, *Farr v. Pritchess*, 522 F.2d 464 (9th Cir.1975), held that a state judge could properly put a reporter in jail for refusing to divulge a source to the court. The Supreme Court decision *Farr* applied was *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), which held that a state judge could properly put a reporter in jail for refusing to disclose his source to a grand jury. The concurrence in *Branzburg*, and this court in *Farr*, included language suggesting that in some cases, but not the cases being decided, reporters might be privileged to refuse to disclose their sources. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), a subsequent Supreme Court decision, held that, in a civil defamation action, a reporter lacked a privilege which would entitle him to refuse to disclose materials relating to editorial processes and his state of mind and knowledge.

Of the three circuits relied upon by the majority, two held against the party asserting the privilege, *von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir.1987) and *United States v. La Rouche Campaign*, 841 F.2d 1176 (1st Cir.1988). *von Bulow* upheld the contempt order against the author. She had to produce the manuscript. *La Rouche* affirmed a contempt order against NBC. NBC had to produce for in camera review videotapes which it had chosen not to broadcast. Only in *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980), did the proponent of the privilege win anything. CBS successfully appealed a contempt order, because the subpoena did not comply with Fed.R.Crim.P. 17, and because the party seeking production had not demonstrated its inability to get the informa-

---

1. Section 12–2237 states:

 A person engaged in newspaper, radio, television or reportorial work, or connected with or employed by a newspaper, radio, or television station, shall not be compelled to testify or disclose in a legal proceeding or trial or any proceeding whatever, or before any jury, inquisitorial body or commission, or before a committee of the legislature, or elsewhere, the source of information procured or obtained by him for publication in a newspaper or for broadcasting over a radio or television station with which he was associated or by which he is employed.

2. In *Matera*, the Court of Appeals of Arizona held that application of the media subpoena law, A.R.S. § 12–2214, is "limited to persons engaged in the gathering and dissemination of news to the public on a regular basis." 825 P.2d at 973.

tion elsewhere. When a court holds that a party claiming a privilege loses for a particular reason, we cannot properly say that the court held that a proponent would be entitled to win if the reason did not apply. All we can say is that the case is distinguishable. The majority is creating new law, not conforming our law to that of other circuits.

Two previously unanswered questions of constitutional law are controlled by the majority opinion: (1) whether the first amendment journalists' privilege applies to nonconfidential statements of disclosed sources;[3] and (2) whether the privilege applies in favor of a commercial writer not employed in the profession of disseminating periodic, current reports in the manner of journalists. We need not reach either of these questions. Our decision in *Farr* did not reach so far, and should not be extended here.

We should follow the well established principle that "[e]videntiary privileges in litigation are not favored." *Herbert*, 441 U.S. at 175, 99 S.Ct. at 1648. The reason is that they stand in the way of ascertaining the truth. VIII Wigmore, *Evidence* § 2192, at 73 (McNaughton rev. 1961). The majority's approach nevertheless creates a new privilege which, to the extent that it applies, by logical necessity must reduce the reliability of verdicts and judgments in litigation. The

majority's approach seems to assume that discovery is mandatory unless barred by a privilege. But the rules provide for an area of judicial discretion between these alternatives.

This case can and should be decided on the ground that a proper exercise of discretion under Fed.R.Civ.P. 26(b) required that the subpoena be quashed.[4] Fed.R.Civ.P. 26(b)(1) states:

> (b) Discovery Scope and Limits. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears rea-

---

**3.** I find the expansion of *Farr* to disclosed sources troublesome because the rationale for the development of a journalists' privilege in *Farr* relied on the confidential nature of the source and "the right of the newsmen to keep secret a source of information." 522 F.2d at 467–68. Of the authority relied upon by the majority to support the expansion of the privilege, only the Third Circuit's decision in *Cuthbertson*, extended the privilege to information obtained from nonconfidential sources. 630 F.2d at 147. The commentary by Morse and Zucker discusses the importance of protecting confidential sources regardless of whether the information obtained is held in confidence. The confidentiality of the source, not the information, is the key. It is an important distinction because the primary justification for a journalists' privilege is to protect the ability of reporters to obtain information by granting promises of confidentiality. The information itself is rarely kept confidential, since it is a journalist's business to report.

**4.** Although Watkins did not challenge the district court's exercise of discretion under Rule 26(b), we should reach the issue to avoid determination

of unsettled constitutional questions. Generally, we do not address issues not raised by the parties on appeal, *see United States v. Carbajal*, 956 F.2d 924, 930 n. 2 (9th Cir.1992), but we are not compelled to decide the case on the issues raised. *Cf. United States v. Mendoza–Fernandez*, 4 F.3d 815, 818 (9th Cir.1993) (vacating sentence on grounds not argued by appellant). "[A] federal court should decide constitutional questions only when it is *impossible* to dispose of the case on some other ground." *Erickson*, 976 F.2d at 1301 (emphasis added). The parties can ask us to decide a question of constitutional law, but cannot force us to do so when the case may be decided on an alternative ground. I asked counsel in the plainest terms at oral argument why Watkins should not prevail on the ground that the district court abused its discretion, obviating the need to decide whether Watkins had a privilege, so the parties had the opportunity to address the issue. If my approach had become the basis for decision, then we would be required to "give serious consideration to requesting additional briefing and oral argument before issuing a disposition predicated upon the [unbriefed] point." Ninth Circuit General Orders 4.2.

sonably calculated to lead to the discovery of admissible evidence.

The frequency or extent of use of the discovery methods set forth in subdivision (a) *shall be limited by the court if it determines that: (i) the discovery sought* is unreasonably cumulative or duplicative, or *is obtainable from some other source that is more convenient, less burdensome, or less expensive*; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).

Fed.R.Civ.P. 26(b) (emphasis added). We review a district court's discovery rulings for abuse of discretion. *United States v. Bourgeois,* 964 F.2d 935, 937 (9th Cir.1992). The district judge abused his discretion by ordering the writer to disclose what L.S. Shoen had told him, because the plaintiffs had not yet requested that information from Shoen.

The discovery was not central to the lawsuit. The lawsuit was against L.S. Shoen and a faction of the Shoen family for defaming the plaintiffs by making statements in 1989 and 1990 suggesting that they might be involved in the murder of their sister-in-law. It is important to note that plaintiffs were not suing Watkins for libel, and were not suing Shoen for anything he told Watkins. They were suing Shoen for things he had said before he began working with Watkins. In their motion to compel filed in district court, the plaintiffs said they "have yet to obtain any conclusive admission that defendants undertook their media relations efforts for purposes or linking plaintiffs to the murder." Plaintiffs also asserted Watkins' notes and tapes would "provide the exact content of L.S.'s defamatory message to the media— but also whatever malicious motivations impelled those communications." At oral argument, they said "communications made as to the personal feelings, ill will, what have you, of L.S. Shoen toward the plaintiffs, they're directly relevant as to motive. If they're inconsistent statements, they can be utilized to impeach L.S. Shoen."

Yet they did not depose L.S. Shoen and ask him about his statements, purposes, motivations and feelings.[5] Their lawyer could ask him, under oath, whether he had accused them of murder in his discussions with Watkins and why. He might well say yes, and explain why. His answers might well vitiate the need to do any discovery with Watkins at all. He might give them testimony so useful to their case that they would not want to dilute it with anything from Watkins. The

---

**5.** The majority opinion explains, correctly I think, that L.S. Shoen's answers to interrogatories are not fully satisfactory. The answers would, to any experienced trial lawyer, invite a deposition. But we need not and should not rely upon the answers to interrogatories. We denied a motion to supplement the record with them, because the district judge never saw them. We are supposed to be deciding whether that judge abused his discretion, and we cannot properly decide that on the basis of evidence he never saw.

Ordinarily interrogatories and answers are exchanged between counsel but not filed in court, unless they are attached as exhibits to motion papers. Under Fed.R.Civ.P. 5(d), discovery papers such as answers to interrogatories must be filed unless the court orders otherwise. But the district of Arizona, like most federal district courts, "orders otherwise" by a local rule prohibiting the filing of answers to interrogatories except as exhibits to motions or at a hearing or trial. Local Rule 3(a)(2) states:

Discovery Papers. Unless ordered by the Court, Depositions, Interrogatories and answers thereto, Requests for Production, Inspection or Admission, and responses thereto, shall not be filed with the Court, except that a "Notice of Service" of the foregoing papers on opposing counsel shall be filed with the Court. Filing the Notice of Taking Deposition required by Rule 30(b)(1) of the Rules of Civil Procedure will satisfy the requirements of filing a "Notice of Service" with respect to depositions. This Rule shall not preclude the use of discovery papers at a hearing or trial or as exhibits to motions.

U.S. Dist.Ct., D.Ariz., R. 3(a)(2). The interrogatories were not available to Judge Strand when he had to decide whether to compel Watkins to produce his notes, recordings, etc. documenting his conversations with L.S. Shoen. If plaintiffs thought he should consider the inadequacy of Shoen's answers, then they should have attached the answers as an exhibit to their motion papers.

materials submitted suggest a strong possibility that L.S. Shoen would testify that he hated the plaintiffs, thought they had killed Eva, and had said so to reporters. That is substantially what they want Watkins' notes and tapes to prove. L.S. Shoen might testify less helpfully, so that Watkins' materials could be useful to impeach Shoen or prove something different from what he said in deposition, but there would be time enough to pursue the impeachment evidence after establishing that there was something to impeach.

That Watkins' notes and tapes might contain relevant information does not compel the conclusion that plaintiffs can use a subpoena duces tecum to get them, and to depose Watkins and get them prior to deposing L.S. Shoen. The district judge could, under Fed. R.Civ.P. 26(b)(1)(i), limit the discovery of Watkins if he determined that the discovery sought was obtainable from L.S. Shoen at less burden. The judge could grant a protective order to Watkins under 26(c) to protect Watkins from annoyance, embarrassment, oppression and undue burden. The judge could, under 26(d), in the interests of justice, require that the sequence of discovery should be first Shoen, then Watkins if necessary. Any one of these invitations in the rule to exercise discretion, if accepted, would have avoided the harm. It was an abuse of discretion to reject all of them.

Why do plaintiffs insist on asking Watkins what L.S. Shoen thought and felt instead of asking Shoen? Either this is an inefficient approach to getting the answer, or the purpose is more to intimidate Watkins as he writes his book, than to find out the answer. Requiring plaintiffs to ask Shoen first would prevent the discovery from being sought for an improper purpose.

There were significant burdens on Watkins. He testified that his sources were drying up because they heard that plaintiffs' lawyers were requiring him to testify, and demanded his assurance that he would go to jail for contempt rather than disclose their identities. It is true that L.S. Shoen's disclosures to him, far from being confidential as in the usual confidential source case, are intended to be broadcast to as large a public

as will buy the book he is writing. But Watkins has a legitimate commercial interest in shaping the mode, form, and timing of disclosure so that the commercial success and public impact of his book is not frittered away by prepublication news stories. The discovery could scare away sources, and intimidate Watkins as he writes his book, perhaps inducing him to shy away from stating what he believes to be the truth about the plaintiffs. A rough deposition can be an intimidating experience. Watkins' interests are legitimate, and deserve some consideration in discovery orders.

Courts typically and correctly shy away from discovery orders where First Amendment interests may be implicated. Watkins does not need a solid constitutional claim of privilege to justify an exercise of discretion which would postpone discovery from Watkins until the unquestionably permissible discovery from L.S. Shoen had been done first. Judge Weinstein explained an exercise of discretion in these terms in *Apicella v. McNeil Laboratories*, 66 F.R.D. 78 (E.D.N.Y. 1975). In denying a motion to compel discovery of editorial materials and sources on a newsletter, he reasoned that even though "No absolute rule of privilege protects newsmen," *id.* at 83, nevertheless the parties requesting disclosure "should be able to show that they are unable to obtain the information from a source other than the Medical Letter." *Id.* at 85. The reason for requiring them to try another source first was "the possible adverse impact on First Amendment rights." *Id.*

Judge Weinstein noted that Judge Bonsal, in a situation somewhat analogous to ours, denied discovery of a reporter's sources when other sources of information had not been exhausted. *Id.* Exhaustion is a matter of discretion, under Fed.R.Civ.P. 26(d), to be considered along with expense of exhausting other sources, and other considerations which may arise. Here, the Shoens failed to depose their father, L.S., before seeking to depose Watkins about L.S. Shoen's thoughts and feelings. No constitutional privilege is necessary to require the district judge to exercise discretion under the criteria established in Fed.R.Civ.P. 26. Here, L.S. Shoen

**1302**

was a "more convenient, less burdensome" source.

A civil defamation lawsuit is important. But it is not the only thing that is important. The writing and publication of a book is also important. The lawsuit threatens the book. Considering the relatively small value of Watkins' information to ascertaining the truth in the lawsuit, and the potentially great burden the discovery might impose on writing and publication of the book, the judge should have exercised his discretion to make the plaintiffs ask L.S. Shoen their questions first. The likelihood that plenary discovery from Watkins would be necessary was low.

I would reverse and remand on the ground that the district court abused its discretion under Fed.R.Civ.P. 26 by failing to require the Shoens to seek the information regarding the content of the Watkins interviews from L.S. Shoen before going to Watkins.