

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-6-1998

# Titan Sports Inc v. Turner Broadcasting

Precedential or Non-Precedential:

Docket 97-3267

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Titan Sports Inc v. Turner Broadcasting" (1998). *1998 Decisions.* Paper 185.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/185

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 6, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3267

IN RE: MARK MADDEN

TITAN SPORTS, INC., A Delaware Corporation

v.

TURNER BROADCASTING SYSTEMS, INC.; WORLD
CHAMPIONSHIP WRESTLING, INC.; ERIC BISCHOFF

TITAN SPORTS, INC.,

      Appellant

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. Civil No. 96-MC-00681)

Argued December 9, 1997

Before: NYGAARD, ALITO and LAY,*
Circuit Judges

(Amended Opinion Filed: August 6, 1998)

_____

*The Honorable Donald P. Lay, Senior United States Circuit Judge for
the United States Court of Appeals for the Eighth Circuit, sitting by
designation.

Robert L. Byer, Esq. (Argued)
Jerry S. McDevitt, Esq.
Paul K. Stockman, Esq.
Kristen M. Del Sole, Esq.
Kirkpatrick and Lockhart
1500 Oliver Building
Pittsburgh, Pennsylvania 15222

Counsel for Appellant

David Dunn, Esq.
John H. Pope, Esq. (Argued)
Davis, Scott, Weber & Edwards
100 Park Avenue – 32nd Floor
New York, New York 10017

Counsel for Appellees

AMENDED OPINION OF THE COURT

NYGAARD, Circuit Judge.

The issue on appeal is whether the district court erred by concluding that Mark Madden, a nonparty witness in this civil matter, is entitled to claim a journalist's privilege. We hold that he is not and will reverse.

I.

We will summarize only those facts necessary to give context to the issue. Appellant Titan Sports, Inc., and its competitor, Turner Broadcasting Systems (TBS), are the most prominent professional wrestling promoters in the United States. TBS's "World Championship Wrestling" (WCW) has challenged Titan's "World Wrestling Federation" (WWF) to engage in "interpromotional events," wherein WCW wrestling personalities would compete with WWF personalities. Titan has refused to permit any of its wrestlers to engage in the activities.

Titan sued TBS in the United States District Court for the District of Connecticut alleging unfair trade practices, copyright infringement and other pendent state law claims,

none of which are germane to this appeal. Titan Sports Inc. v. Turner Broadcasting Systems, Inc., No. 396-cv-01139 (D. Conn.) (the Connecticut action). As part of the discovery process in the Connecticut action, however, Titan issued a subpoena to take the deposition of Mark Madden, a nonparty witness who is employed by WCW, and resided in the Western District of Pennsylvania.

WCW employs Madden to produce tape-recorded commentaries, which are replayed to callers on WCW's 900-number hotline. These commentaries promote upcoming WCW wrestling events and pay-per-view television programs, announce the results of wrestling matches and discuss wrestlers' personal lives and careers. Madden asserts that in the course of preparing statements for the WCW hotline, he receives information from confidential sources. He admits, however, that his announcements are as much entertainment as journalism.

During a deposition, Madden refused to identify the sources of certain of his allegedly false and misleading statements recorded for the WCW's 900-number hotline. Madden, through counsel, invoked a "journalist's privilege" and the protection of the Pennsylvania Journalist's Shield Law, 42 Pa. Cons. Stat. Ann. S 5942.1 Titan filed a "Motion to Enforce Subpoena and Otherwise Compel Discovery by a Nonmoving Party." After Titan moved to enforce the subpoena, counsel for Madden and the WCW interposed the qualified federal common law privilege which protects journalists from revealing their confidential sources.

The district court denied Titan's motion insofar as it sought to compel Madden to identify the sources from which he got information for his commentaries. The district court concluded that Madden was a "journalist" with standing to assert the privilege because he intended to disseminate information to third parties. The district court also held that Madden's interest in protecting his sources was not outweighed by the need for disclosure. Titan now appeals.

_____

1. The district court's opinion concerned only the federal privilege. The applicability of the Pennsylvania law is not appealed.

II.

The somewhat unusual procedural posture of this case requires that we discuss briefly our jurisdiction to hear this appeal. We have jurisdiction over "all final decisions of the district courts. . ." 28 U.S.C. S 1291.2 A final decision of a district court means, with limited exceptions, an order that ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment. Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S. Ct. 2454, 2457 (1978). Ordinarily, a pretrial discovery order such as this one is not considered final. Enprotech Corp. v. Renda, 983 F.2d 17, 20-21, (3rd Cir. 1993), (an order denying a pretrial civil discovery motion to compel production of a document was not final and appealable). The typical remedy for one aggrieved by an order denying a discovery request is to await final judgment before appealing. Id.

The order appealed from in this case is not a typical discovery order. Although it relates to discovery and the deposition of a nonparty witness, it was not entered by the district court where the case was filed and is currently pending. The district court for the District of Connecticut will ultimately rule on the merits, and an appeal from its final judgment will be heard by the Court of Appeals for the Second Circuit. Other courts have recognized an "exception to the nonfinality of discovery orders where a district court, other than the district court before which the main action is pending, issues an order denying discovery against a nonparty." Hooker v. Continental Life Insurance Co., 965 F.2d 903, 905 (10th Cir. 1992); citing Truswal Sys. Corp. v. Hydro-Air Eng'n, Inc., 813 F.2d 1207, 1209 (Fed. Cir. 1987).3 The premise for this exception is that these orders involve

_____

2. In pertinent part, 28 U.S.C. S 1291 provides that "the courts of appeals shall have jurisdiction of appeals from allfinal decisions of the district courts of the United States . . . ."

3. When an ancillary district court enters an order against a nonparty which compels discovery, such an order is not immediately appealable, leaving the nonparty with the option to either comply with the discovery order or submit to contempt proceedings from which the nonparty may then appeal. See Hooker, 965 F.2d at 905 n.1 (citing Federal Trade Comm'n v. Alaska Land Leasing Inc., 778 F.2d 577, 578 (10th Cir. 1985)).

4

nonparties and are issued by district courts other than the one in which the principal action is pending, thereby eliminating any avenue for effective appellate review.

We agree with this premise but believe, rather than as an exception, finality for purposes of our jurisdiction in this circumstance is determined more directly by asking whether the aggrieved entity has any means, other than an immediate appeal before us, to obtain appellate review of the district court's decision. For Titan, the answer is no, because the Court of Appeals for the Second Circuit does not have jurisdiction to review this order of the Western District of Pennsylvania. Were we to reject jurisdiction, appellate review of this order would be impossible. Consequently, because we are the only forum that may review the decision, we deem it final and conclude that we have jurisdiction under 28 U.S.C. S 1291 to review it.

III.

The decision we review is the district court's order granting a journalist's privilege to Madden. The issue is whether he has status as a journalist to invoke the protections of the privilege. We conclude that he does not. Because this is a purely legal question, our review is plenary. Bradgate Assoc. v. Fellows, Red & Assoc., 999 F.2d 745, 749 (3d Cir. 1993). We note at the outset that testimonial exclusionary rules and privileges are not favored. Indeed, the Supreme Court has not shown enthusiasm for the creation of constitutional privileges because these privileges "contravene a fundamental principle of our jurisprudence that the public has a right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331, 70 S. Ct. 724, 730 (1950). Such privileges should not be "lightly created or expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710, 94 S. Ct. 3090, 3108 (1974). Pretrial discovery is therefore, "accorded a broad and liberal treatment." Hickman v. Taylor, 329 U.S. 495, 507, 67 S. Ct. 385, 392 (1947). If no claim of privilege applies, a non-party can be compelled to produce any matter "relevant to the subject matter involved in the pending action" or

5

"reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Nonetheless, we have recognized that when a journalist, in the course of gathering the news, acquires facts that become a target of discovery, a qualified privilege against compelled disclosure appertains. Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979) (journalist's privilege for civil cases); United States v. Cuthbertson, 630 F.2d 139 (3d Cir. 1980) (journalist's privilege for criminal cases). Premised upon the First Amendment, the privilege recognizes society's interest in protecting the integrity of the newsgathering process, and in ensuring the freeflow of information to the public. It is an interest of "sufficient legal importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." Herbert v. Lando, 441 U.S. 153, 183, 99 S. Ct. 1635, 1652 (Brennan, J., dissenting).

Although we have determined that a journalist's privilege exists, we have never decided who qualifies as a"journalist" for purposes of asserting it. The Supreme Court has warned of the difficulties in such an undertaking:

> [S]ooner or later, it [will] become necessary to define those categories of newsmen who qualify for the privilege -- a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer just as much as the large, metropolitan publisher.

Branzburg v. Hayes, 408 U.S. 665, 703-04, 92 S. Ct. 2646, 2668 (1972).

We have found few cases that discuss who, beyond those employed by the traditional media, has status to raise the journalist's privilege. Courts have previously permitted documentary film-makers to invoke the protections of the journalist's privilege. See Silkwood v. Kerr-McGee, 563 F.2d 433, 436 (10th Cir. 1977). Also, authors of technical publications and professional investigative books have been permitted to claim the privilege. See Apicella v. McNeil Lab. Inc., 66 F.R.D. 78 (E.D.N.Y. 1975) (technical publications are within the scope of journalist's privilege because the traditional doctrine of freedom of the press is the right of all

6

types of reporters); Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir. 1993) (professional investigative book author has status to claim journalist's privilege). No other court, however, has considered whether the privilege may be invoked by those like Madden who are neither "pamphleteers" nor "metropolitan publishers," and certainly not engaged in investigating, publishing, reporting or broadcasting in the traditional sense.

To date, only one other court of appeals has fashioned a test to answer the question of who has status to invoke a journalistic privilege. In von Bulow v. von Bulow, the Court of Appeals for the Second Circuit identified the principles underlying the application of the journalist's privilege. 811 F.2d 136, 142 (2nd Cir. 1987). First, the court recognized that the process of newsgathering is a protected, albeit qualified, right under the First Amendment. This right emanates from the strong public policy supporting the unfettered communication of information by a journalist to the public. Second, the court required a true journalist, at the beginning of the news-gathering process, to have the intention of disseminating her information to the public. Third, the court stated that an individual may successfully claim the journalist's privilege if she is involved in activities traditionally associated with the gathering and dissemination of news, even though she may not ordinarily be a member of the institutionalized press. Fourth, the relationship between the putative journalist and her sources may be confidential or nonconfidential. And fifth, unpublished resource material likewise may be protected.

In holding that "the individual claiming the privilege must demonstrate, through competent evidence, the intent to use the material in order to disseminate information for the public and such intent must have existed at the inception of the newsgathering process," the court turned to its opinion in Baker v. F&F Investment, 470 F.2d 778 (2nd Cir. 1972). Baker was a civil rights case in which it was alleged that racial discrimination was practiced in the sale of housing in Chicago. During discovery, the plaintiffs deposed the editor of the Columbia Journalism Review, who had written an article on "blockbusting" -- an allegedly illegal housing application process -- ten years earlier. That

7

article, which had been published in the Saturday Evening Post, had been based, in part, on information forwarded to the editor by an anonymous real estate agent. The editor refused to disclose the identity of the real estate agent at deposition.

The court held that the editor could not be compelled to disclose the identity of his source. Central to the court's holding was its concern that the "deterrent effect such disclosure is likely to have upon future `undercover' investigative reporting . . . threatens freedom of the press and the public's need to be informed." Id. at 782 (emphasis in original). Based on the rationale of Baker, the court concluded that "the critical question in determining if a person falls within the class of persons protected by the journalist's privilege is whether the person, at the inception of the investigatory process, had the intent to disseminate to the public the information obtained through the investigation." von Bulow, 811 F.2d at 143. In contrast, a person who "gathers information for personal reasons, unrelated to dissemination of information to the public, will not be deterred from undertaking his search simply by rules which permit discovery of that information in a later civil proceeding." Id. In other words, von Bulow holds that the purpose of the journalist's privilege was not solely to protect newspaper or television reporters, but to protect the activity of "investigative reporting." Id. at 142-43.

Indeed, in adopting the test set forth in the von Bulow decision, the Court of Appeals for the Ninth Circuit has indicated that the journalist's privilege was designed not to protect a particular journalist, but "the activity of investigative reporting more generally." Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir. 1993). Thus, "it makes no difference whether the intended manner of dissemination was by newspaper, magazine, book, public or private broadcast or handbill because the press, in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." Id. at 144 (quoting Lovell v. Griffin, 303 U.S. 444, 452, 58 S. Ct. 666, 669 (1938)).

We find the reasoning of the court in von Bulow, and by extension in Shoen to be persuasive. In our view, the von

Bulow test is consistent with the goals and concerns that underlie the journalist's privilege. Because this test emphasizes the intent behind the newsgathering process rather than the mode of dissemination, it is consistent with the Supreme Court's recognition that the "press" includes all publications that contribute to the free flow of information. See Lovell, 303 U.S. at 452, 58 S. Ct. at 669 (1938). This test is also consistent with the Supreme Court's concerns that the privilege apply only to legitimate members of the press. Id. at 457, S. Ct. at 674. This test does not grant status to any person with a manuscript, a web page or a film, but requires an intent at the inception of the newsgathering process to disseminate investigative news to the public. As we see it, the privilege is only available to persons whose purposes are those traditionally inherent to the press; persons gathering news for publication. It is the burden of the party claiming the privilege to establish their right to its protection. von Bulow, 811 F.2d at 144.

The district court correctly looked to von Bulow as the appropriate test to use in determining who qualifies as a "journalist" for purposes of claiming privilege. We believe, however, that the district court read the von Bulow decision too expansively and in doing so elided the requirement that the individual be engaged in the activity of news gathering or investigative reporting. The district court believed that because Madden "sought, gathered or received" materials from the WCW with the intention of disseminating that material, he was a journalist. We conclude that more is required to claim the privilege.

As we have indicated previously, we agree with von Bulow that the person claiming privilege must be engaged in the process of "investigative reporting" or "news gathering." Moreover, we agree with Shoen, which held that the critical question for deciding whether a person may invoke the journalist's privilege is "whether she is gathering news for dissemination to the public." Shoen, 5 F.3d at 1293. We hold that individuals are journalists when engaged in investigative reporting, gathering news, and have the intent at the beginning of the news-gathering process to disseminate this information to the public. Madden does not pass this test.

Madden's activities in this case cannot be considered "reporting," let alone "investigative reporting." By his own admission, he is an entertainer, not a reporter, disseminating hype, not news. Although Madden proclaims himself to be "Pro Wrestling's only real journalist," hyperbolic self-proclamation will not suffice as proof that an individual is a journalist. Moreover, the record reveals that all of Madden's information was given to him directly by WCW executives. Madden's deposition testimony acknowledges that WCW employees were his sole source of information for his commentaries. He uncovered no story on his own nor did he independently investigate any of the information given to him by WCW executives. Madden also fails the test in two other critical aspects: first, he was not gathering or investigating "news," and second, he had no intention at the start of his information gathering process to disseminate the information he acquired. Madden's work amounts to little more than creative fiction about admittedly fictional wrestling characters who have dramatic and ferocious-sounding pseudonyms like "Razor Ramon" and "Diesel." As a creative fiction author, Madden's primary goal is to provide advertisement and entertainment-- not to gather news or disseminate information. It is clear from the record that Mr. Madden was not investigating"news," even were we to apply a generous definition of the word. Madden admits in his deposition that his work for the WCW amounts to a mix of entertainment with reporting. He states that "with the WCW 900 number, I say things tongue [in] cheek. I say things for satire value, I say things to be funny, and sometimes I will take something like that and use it for humor value." Furthermore, the record indicates that WCW executives told Madden to "be a little crazy, say off the wall stuff, entertain, use a lot of humor, sort of work -- sort of be like the bad guy in the literal sense, not in terms of what I say is always going to be false, but in terms of what I say is going to get people excited."

Even if Madden's efforts could be considered as "newsgathering," his claim of privilege would still fail because, as an author of entertaining fiction, he lacked the intent at the beginning of the research process to disseminate information to the public. He, like other creators of fictional works, intends at the beginning of the

process to create a piece of art or entertainment. Fiction or entertainment writers are permitted to view facts selectively, change the emphasis or chronology of events or even fill in factual gaps with fictitious events-- license a journalist does not have. Because Madden is not a journalist, it follows that he cannot conceal his information within the shadow of the journalist's privilege. 4

IV.

To summarize, we hold that individuals claiming the protections of the journalist's privilege must demonstrate the concurrence of three elements: that they: 1) are engaged in investigative reporting; 2) are gathering news; and 3) possess the intent at the inception of the news-gathering process to disseminate this news to the public. Madden, having failed to sustain his burden, cannot protect his sources or his information by invoking the journalist's privilege. We will reverse the order and remand the cause to the district court.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

_____

4. We have indicated that a bona fide journalist has a qualified privilege.
We do not reach the district court's balancing of the competing interests involved in the application of this privilege because of our determination that Madden does not have status to raise the privilege in the first place.