# Melvin v. Doe

C.P. of Allegheny County, no. GD99-10264.

*John R. Orie Jr.* and *Robert O. Lampl,* for plaintiff.
*Ronald D. Barber* and *Witold J. Walczak,* for defendants.
*Ann Beeson* and *Christopher A. Hansen,* of counsel to defendants.

WETTICK JR., *J.,* November 15, 2000—The issue that I address in this opinion and order of court is whether the First Amendment protects the anonymity of the person or persons who anonymously published an allegedly defamatory statement on an Internet website after the plaintiff has made a prima facie showing that the statement was false, that the statement was defamatory, and that she has sustained harm that would support a monetary award.[1]

## I.

This defamation action was instituted against an unknown person or persons who published the following statement on a website posted on America Online:

"Despite being prohibited from engaging in political activity, a couple of judges have been keeping themselves pretty busy recently with politics. Judge Joan Orie Melvin

---

1. It is likely that the identity of the publisher can be learned through discovery directed to America Online Inc.

has been lobbying the Ridge administration on behalf of a local attorney seeking the appointment by Governor Ridge to fill the vacancy on the Allegheny County Court of Common Pleas created by the mandatory retirement earlier this month of Judge Robert Dauer, now a senior judge. Dauer has also been actively pushing for this attorney's appointment. The last GS99 heard, this attorney is on the governor's short-list of candidates. Let's hope that the gov does the right thing and appoints somebody better qualified. Shame on Orie Melvin and Dauer—this is exactly the kind of misconduct by our elected officials that the residents of Allegheny County will not stand for anymore . . . and a good reason why judges should be held accountable for their actions and remembered at the polls at retention time."

In response to plaintiff's discovery requests designed to obtain the identity of the person or persons who published the statement, the Doe defendant(s) retained counsel to provide a defense to plaintiff's lawsuit. Counsel for the Doe defendants have challenged any discovery that would identify the person or persons who published the statement on the ground that the First Amendment permits anonymous political speech.

I agreed with counsel for defendants that plaintiff should not be permitted to engage in discovery to learn the identity of the Doe defendants until the Doe defendants had an opportunity to establish that, as a matter of law, plaintiff could not prevail in this lawsuit.[2] Conse-

---

2. A plaintiff should not be able to use the rules of discovery to obtain the identity of an anonymous publisher simply by filing a complaint that may, on its face, be without merit. See Pa.R.C.P. 4011(b)

quently, I stayed the discovery which plaintiff sought in order to give the defendants the opportunity to show that plaintiff could not make out a prima facie case. In a separate memorandum and order of court, I am denying defendants' motion for summary judgment because plaintiff has produced evidence which would support a finding that the statement was made, the statement is false, the statement is defamatory, and she has sustained actual harm. (Defendants did not through preliminary objections—or otherwise—raise the argument that the statement is not defamatory.)

Defendants also requested that I bifurcate the issue of defendants' states of mind from all other issues, that I stay any discovery on defendants' states of mind until plaintiff has prevailed before a jury on all other issues in the case, and that I enter a protective order preventing plaintiff from conducting any discovery to determine the identity of the Doe defendants' at least until plaintiff has prevailed on all issues except defendants' states of mind. I denied defendants' motion to bifurcate the issues in this fashion because the jury, in deciding whether plaintiff has met her burden of proving that the statements are false, needs to know the identity of the persons who made the publication.[3] For example, it would make a signifi-

which provides that no discovery shall be permitted that would cause unreasonable annoyance, embarrassment, oppression, burden or expense to any person or party.

3. In defamation claims against media defendants based on publicly disseminated statements, a public official or public figure cannot recover without establishing by a preponderance of the evidence that the statements were false. *Milkovich v. Lorain Journal Co.,* 110 S.Ct. 2695 (1990); *Philadelphia Newspaper Inc. v. Hepps,* 106 S.Ct. 1558 (1986).

cant difference to the jury whether John Doe is a prisoner whom plaintiff sentenced to a twenty-year jail term or a member of the governor's staff.

This is not a case in which the defendants are basing their defense on the testimony of a witness, whom they have identified, who allegedly participated in, observed, or was told by plaintiff of her lobbying activities. To the contrary, defendants have not identified any source. Thus, if the case was bifurcated, the defense of the defendants on the issue of truth would be that plaintiff has not met her burden of proving that the statements of her unknown accusers are false. Plaintiff, if not given the opportunity to confront her accusers, can only deny the charges and hope that this is sufficient to persuade the jury.

Also, plaintiff needs to know the identity of the Doe defendants prior to incurring the expenses and other burdens of a trial, because it is questionable whether plaintiff would wish to proceed with a trial if John Doe turned out to be, for example, an inmate incarcerated pursuant to a trial before plaintiff. In this instance, it is unlikely that any judgment that she obtained would be satisfied. Furthermore, her name would be "cleared" through the disclosure that the publication was made by someone whom she had sentenced to jail.[4]

---

4. It is unclear that the bifurcation that defendants proposed would significantly alter the impact that libel litigation would have on Internet speech. Any bifurcation helps only the defendant who has the money to offer a defense and the John Doe defendant typically lacks the resources necessary to defend against a defamation action. Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace,* 49 Duke L.J. 855, 861 (2000).

## II.

Under the Pennsylvania Rules of Civil Procedure, plaintiff is entitled to depose third parties to obtain the identity of the person or persons who published the statement unless this information is privileged under the First Amendment. This information is highly relevant. Rule 4003.1 permits discovery of any matter, not privileged, which is relevant to the subject matter invoked in the pending litigation, subject to Rules 4003.2 to 4003.5 and Rule 4011. Rules 4003.2 to 4003.5 have nothing to do with the discovery which plaintiff seeks. Rule 4011 reads as follows:

"No discovery or deposition shall be permitted which

"(a) is sought in bad faith;

"(b) would cause unreasonable annoyance, embarrassment, oppression, burden or expense to the deponent or any person or party;

"(c) is beyond the scope of discovery as set forth in Rules 4003.1 through 4003.6; or

"(d) Rescinded.

"(e) would require the making of an unreasonable investigation by the deponent or any party or witness.

"(f) Rescinded."

Rule 4011(a) would apply if the only purpose of this lawsuit is to harm the defendants without a trial. However, this rule does not apply if the purpose of the lawsuit is to restore plaintiff's good name by showing that she never engaged in the conduct described in the publication. There is no evidence that would permit me to

find that plaintiff is pursuing this lawsuit for any reason other than to restore her good name.

Rule 4011(b) bars only discovery that would cause *unreasonable* embarrassment, oppression, or burden. Rule 4011(b) does not apply because (1) plaintiff has made a prima facie showing that she has a valid cause of action, (2) plaintiff cannot pursue this cause of action without the discovery that she seeks, and (3) the discovery request does not impose unreasonable burdens on any third persons.

### III.A.

In support of their request for a protective order, defendants argue that anonymous political speech is protected by the First Amendment. Without anonymity, a speaker would be deterred from expressing controversial ideas or criticizing powerful figures. For example, an employee of a company would be reluctant to establish a website that encourages other employees to form a union if anonymity was not guaranteed. Similarly, without anonymity, a teacher in a unionized school district may be reluctant to establish a website which describes the weaknesses of the school system and proposes publicly funded private schools through vouchers furnished to parents.

Federal case law protects anonymity for political speech that is not actionably false. Thus, the First Amendment would bar a state court from allowing discovery compelling any third person to identify the publishers of the statements described in the above examples. However, case law does not extend First Amendment protections to anonymous speech that is defamatory, if untrue.

In *McIntyre v. Ohio Elections Commission,* 115 S.Ct. 1511 (1995), the court ruled that an Ohio statute which prohibited the distribution of anonymous campaign literature was a law abridging freedom of speech within the meaning of the First Amendment. The Ohio statute applied to any unsigned documents designed to influence voters in an election. Ohio contended that the legislation was justified by two important and legitimate state interests: (1) an interest in providing the electorate with relevant information and (2) an interest in preventing fraudulent and libelous statements. The court summarily rejected the first justification for the law, that the electors should have sufficient information in order to evaluate the document's message, because this would be no different from a requirement that a writer make statements or disclosures that the writer would otherwise omit. The court recognized that people can see that the writing is anonymous and evaluate its anonymity along with its message.

As to the state's interest in preventing fraudulent and libelous statements, the court stated:

"The state's interest in preventing fraud and libel stands on a different footing. We agree with Ohio's submission that this interest carries special weight during election campaigns when false statements, if credited, may have serious adverse consequence for the public at large." *Id.* at 1520.

However, the court found that this legislation was both (1) overly broad because it "encompasses documents that are not even arguably false or misleading [and] that present neither a substantial risk of libel nor any poten-

tial appearance of corrupt advantage" (*id.* at 1521) (footnotes omitted) and (2) unnecessary because Ohio already has criminal laws that make it illegal for any person during the course of a campaign to publish, post, circulate, distribute or otherwise disseminate a false statement, either knowing the same to be false or acting with a reckless disregard of whether it is false or not. The court said that to the extent that the provisions of the Election Code may be underinclusive, "Ohio courts also enforce the common-law tort of defamation." *Id.* at 1521 n.13.

The court concluded its opinion by recognizing the following: anonymous speech is "an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority." At the same time, the "right to remain anonymous may be abused when it shields fraudulent conduct." In this instance, the state "may, and does, punish fraud directly. But it cannot punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented." *Id.* at 1523.

In *Talley v. State of California,* 80 S.Ct. 536 (1960), the court considered the constitutionality of the provisions of a Los Angeles city ordinance which prohibited any person from distributing any handbill that did not set forth the name of the writer/sponsor. The constitutionality of the ordinance was challenged by a person found guilty of violating the ordinance for distributing handbills that did not comply with the ordinance. These handbills encouraged readers to boycott certain merchants who did not offer equal employment opportunities to minorities. The Supreme Court struck down the

ordinance because identification requirements tend to restrict freedom of expression. In response to the City of Los Angeles' argument that the ordinance provides a way to identify those responsible for fraud, false advertising and libel, the court stated:

"Yet the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose. Therefore, we do not pass on the validity of an ordinance limited to prevent these and other supposed evils. This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires." *Id.* at 538.

Both *McIntyre* and *Talley* suggest that the First Amendment protections afforded the anonymous speaker do not extend to speech that may be false and injurious. If a plaintiff who has been harmed by allegedly defamatory anonymous speech cannot use the tools provided under state law to learn the identity of the speaker, anonymous Internet speech, no matter how false and injurious, would be outside the scope of civil and criminal law for all practical purposes. Such a result is inconsistent with the statements in the *McIntyre* opinion that Ohio has means other than a blanket prohibition of anonymous political speech to protect its interests against the making and disseminating of false statements.[5]

---

5. Also see *Buckley v. American Constitutional Law Foundation Inc.,* 119 S.Ct. 636 (1999), where the court struck down a requirement within a state law that persons circulating petitions for ballot initiatives include the circulator's name and address, but affirmed another provision within the law requiring the filing of affidavits with the names

Defendants correctly state that the United States Supreme Court has never considered the issue of whether the First Amendment imposes restrictions on the ability of a public figure allegedly injured through an allegedly defamatory statement to utilize state law, including the rules of procedure governing discovery and the laws governing the issuance of subpoenas, to learn the identity of the publisher. Defendants next state that I am writing on a clean slate. Thus, I should protect the anonymity of a publisher of an anonymous Internet publication criticizing a public official in the performance of her official conduct on the basis of the argument that the harm that may occur from muzzling legitimate political speech outweighs the harm that may flow from the absence of an adequate civil remedy for deliberate falsehoods. However, the slate is not clean; I am writing on a slate that provides First Amendment protections to persons criticizing public officials only where the protections do not interfere with the underlying purposes of state tort law.

I agree with defendants that the courts have never considered what constitutional protections should be afforded anonymous speech that could play an important role in the political life of this country. By the time the First Amendment was applicable to state libel laws, anonymous political speech played almost no role in the political life of this country. The national media (large newspapers, national magazines, television and radio)

---

of the proponents and paid circulators and the amount of money proponents paid to each circulator for gathering support for the initiatives.

dominated public political discussion. Consequently, the issues that have been litigated involve the manner in which the First Amendment's protections of speech and the press limit the power of the states to award damages under their libel laws. In response to a relatively new phenomenon in which publications were distributed throughout each of the 50 states, the United States Supreme Court was asked to place limitations on state tort law in order to afford adequate breathing room for the good faith coverage of controversial events. Otherwise, jurors in Alabama who were upset with news coverage of events within Alabama would be in the position to dampen speech by punishing the publisher of a national publication that might actually be true, or that the publisher reasonably believed to be true, through large verdicts permitted under state civil actions.

In *New York Times Co. v. Sullivan,* 84 S.Ct. 710 (1964), the Supreme Court imposed the requirement that the plaintiff prove actual malice in a libel action brought by a public official. In *Curtis Publishing Co v. Butts,* 87 S.Ct. 1975 (1967), the court extended the *New York Times* ruling to public figures. In *Gertz v. Robert Welch Inc.,* 94 S.Ct. 2997 (1974) the court held that as long as they do not impose liability without fault, the states may define an appropriate standard of false injury where the plaintiff is a private individual. However, states may not award damages other than compensation for actual injury unless liability is based on a showing of knowledge of falsity or reckless disregard for the truth. In *Bose Corp. v. Consumers Union of United States Inc.,* 104 S.Ct. 1949 (1984), the court held that the appellate courts, rather

than reviewing the judgment below only for clear error, must exercise independent judgment and determine de novo whether the record establishes actual malice with convincing clarity. In *Philadelphia Newspapers Inc. v. Hepps, supra,* 106 S.Ct. 1558, the court held that where the plaintiff is a private figure, but the speech is of public concern, the plaintiff must show that the statement is false; the burden of proving truth cannot be assigned to the defendant.

Defendants correctly state that the *New York Times* line of cases addresses publishers' concerns that they will be exposed to financial harm for criticizing public officials in their performance of public functions. This case law provides protection to the press and the media by making it more difficult for public officials to recover damages. As a result of the *New York Times v. Sullivan* line of cases, the press and the media (according to defendants) are not punished until the public official or public person has established that the statements are false and were maliciously made.[6]

---

6. This argument ignores the costs of providing a defense and the error rate in libel litigation. See Anthony Lewis, *New York Times v. Sullivan Reconsidered: Time to Return to "The Central Meaning of the First Amendment,"* 83 Colum. L. Rev. 602, 614 (1983):

"Any sensible publisher of comment on official conduct must worry about the legal process and its expense. If there is a libel action, he knows there will be a massive discovery process. Apart from cost, his writers and editors may be tied up for months or years. Their editorial decisions will be re-examined, their thoughts probed. A good system of editorial checking may actually prove damaging, because internal criticism of an article or broadcast may become evidence of fault in publishing. The *Sullivan* rule remains a very useful defense before judges. But if the defendant cannot persuade a judge to dispose of the

Defendants argue that while the *New York Times v. Sullivan* line of cases protects the national media, it does little to protect the Internet speaker.[7] According to defendants, the punishment that the anonymous Internet speaker most fears is not an award of money damages but, rather, retribution at the hands of third persons (economic retaliation/social ostracism). This punishment takes place as soon as the speaker is forced to give up his or her anonymity. The punishment occurs regardless of the outcome of the case. In the present case, for example, the punishment which the speaker fears may be inflicted even though the jury ultimately determines that the evidence does not support a defamation finding. While it is the large verdicts that chill the national media, in most instances the plaintiff who brings a libel action against an anonymous Internet speaker never anticipates that she will recover any damages that are awarded.

Defendants correctly state that the thresholds that I imposed before considering plaintiff's discovery request—that the complaint on its face set forth a valid cause of action and that the plaintiff offer testimony that will permit a jury to award damages—can be easily met. These thresholds are met (1) if the plaintiff establishes

case on summary judgment, the rule may not make a difference to jurors. The jury will be free to award compensatory damages unrelated to actual financial loss, and punitive damages on any theory that strikes its fancy."

7. Obviously, this case law provides the same breathing room to the Internet publisher that it provides to the press. Thus, plaintiff in this case cannot prevail without showing that the statements were false and maliciously made.

that the publication appeared on the Internet and that the statements within the publication, if false, support a defamation recovery, and (2) if the plaintiff testifies that the statements are untrue and that she has experienced emotional distress as the result of the statements.[8]

Defendants contend that the Internet, if given adequate First Amendment protection, can change the landscape of public life in this country. A person no longer needs access to a large newspaper, a nationally-circulated magazine, or a radio or television station to reach a large audience. Through the use of a website, a publisher may furnish information to millions of people. Any person or organization with a computer connected to the Internet can now publish information. See *Reno v. American Civil Liberties Union,* 117 S.Ct. 2329, 2335 (1997). ("From the publishers' point of view, it constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers.")

According to defendants, a cornerstone of political speech on the Internet is the protection of the speaker's

---

8. In Pennsylvania, a public figure is entitled to a jury trial upon a showing that the challenged statement can be reasonably construed as defamatory and that there is actual harm inflicted by the defamatory falsehood. Actual harm may include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. The issue of whether actual malice has been established and whether the publication caused more than mere annoyance or embarrassment will seldom be resolved at the preliminary stages of the litigation. See *Tucker v. Philadelphia Daily News,* 757 A.2d 938 (Pa. Super. 2000).

464

anonymity.[9] This is the first time persons without power or funds can reach thousands or even millions of people. Anonymous Internet speakers, unlike the national media, are vulnerable because they lack power or money. Without anonymity, speakers will be less willing to express controversial positions because of fears of reprisal.[10] The speaker who reports that her employer is dumping toxic waste into a river may lose her job if her identity is discovered. If the identity is discovered of the speaker who criticizes a school superintendent on the ground that he is a political hack who hires teachers on the basis of "who they know" rather than competency, life at school for this speaker's children, may become most unpleasant.

---

9. But see Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace, supra,* 49 Duke L.J. at 887 (footnotes omitted):

"Defamation law has the potential to curb the excesses of Internet discourse and to make Internet discourse not just more civil but more rational as well. It is important to note, moreover, that defamation law can serve these functions regardless of whether plaintiffs actually pursue their lawsuits all the way to judgment. Consider again the case of *HealthSouth [Corp.] v. Krum*[, no. 98-2812, (Pa.C.P. Centre Cty. filed Oct. 28, 1998)]. The result of that case sent a powerful message to other users of the Yahoo! financial message boards on which Krum posted his retraction. That message—that users should not rely on anonymity to shield them from being sued if they post abusive and untrue messages—is one that has positive implications for Internet discourse. The quality of speech is improved when speakers realize that their speech has consequences."

10. According to Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace, supra,* 49 Duke L.J. at 861, any possibility that the identity of the speaker can be discovered will discourage legitimate speech because most Internet speakers will not have enough money even to defend against a libel action.

Defendants contend that I am writing on a clean slate because this litigation involves a new manner of communicating political thought. When the national media became the public's primary source of political discussion, the courts developed new rules that prevented state civil libel actions from chilling this political speech. These new rules do not work for anonymous Internet political speech. Furthermore, public figures who are the subject of anonymous Internet speech do not need the protections of state libel laws because anonymous Internet speech is viewed with suspicion.[11] Consequently, the courts need to do for Internet political speech what they did for the national media, namely to develop standards that will adequately protect this new form of political speech.

I do not agree with defendants' argument that the *New York Times v. Sullivan* line of cases supports the proposition that state interests in punishing defamatory speech give way to the First Amendment whenever state libel law will have a significant chilling effect on political

---

11. This contention that anonymous Internet criticism of public figures does not have the same impact as mass media criticism of public figures is disputed. According to Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace, supra,* 49 Duke L.J. at 863 (footnote omitted), Internet communications "are communicated through a medium more persuasive than print, and for this reason they have tremendous power to harm reputation." While it might be tempting to characterize John Doe litigation as Internet SLAPPs (Strategic Lawsuits Against Public Participation), it is the position of Professor Lidsky that "this characterization ignores the power that the Internet gives irresponsible speakers to damage the reputations of their targets and underestimates the potential benefits that defamation law may bring to Internet discourse." *Id.* at 865.

speech. In *New York Times v. Sullivan,* the *New York Times* argued that state libel laws will have an impermissible chilling effect on the First Amendment unless the court bars any libel actions based on criticism of official conduct. Alternatively, the *New York Times* proposed that recovery be limited to actual proved financial injury and/or a requirement of actual malice. A majority of the court rejected each argument other than actual malice. Lewis, *New York Times v. Sullivan Reconsidered: Time to Return to "The Central Meaning of the First Amendment," supra,* 83 Colum.L.Rev. at 607. Thus, the *New York Times* line of cases provides First Amendment protection only where the protection does not significantly interfere with the underlying purposes of state libel law.

In *New York Times v. Sullivan,* the concurring opinions of both Mr. Justice Black (with whom Mr. Justice Douglas concurred) and Mr. Justice Goldberg (with whom Mr. Justice Douglas concurred in the result) recognized that the standards of the majority opinion stopped short of providing protection to criticism that may, in fact, be either true or at least made in good faith. The writers of these opinions proposed that the First Amendment be construed to give the press an absolute immunity from criticism of the manner in which public officials perform their public duties. Otherwise, state libel law will deter the press from criticizing official conduct because the public official "can resort to friendly juries to forestall criticism of their official conduct." 84 S.Ct. at 738 (Goldberg, J. concurring). Mr. Justice Black suggested that the record does not indicate that any differ-

ent verdict would have been rendered by the Alabama jury if the court's charge had included the new "legalistic words" which the majority proposed. *Id.* at 734 (Black, J. concurring).

Mr. Justice Goldberg recognized that many legislators, judges, and executive officers are clothed with absolute immunity against liability for defamatory words uttered in the discharge of their public duties because of the costs and burdens of a trial and because a jury, even if acting in good faith, may return a mistaken verdict. Malice is an illusive concept that may in the mind of a jury add little to the requirement of proving falsity. In his concurring opinion, Mr. Justice Goldberg stated:

"It may be urged that deliberately and maliciously false statements have no conceivable value as free speech. That argument, however, is not responsive to the real issue presented by this case, which is whether that freedom of speech, which all agree is constitutionally protected, can be effectively safeguarded by a rule allowing the imposition of liability on a jury's evaluation of the speaker's state of mind. If individual citizens may be held liable on damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained. . . . To impose liability for critical, albeit erroneous or even malicious, comments on official conduct would effectively resurrect 'the obsolete doctrine that the governed must not criticize their governors.' " *Id.* at 136-37 (Goldberg, J. concurring). (citation omitted)

Mr. Justice Goldberg construed the First Amendment by giving priority to the freedom of speech; he used the

standard that where public matters are involved, the doubt should be resolved in favor of expression rather than against it. *Id.* at 735-36.

The arguments of Mr. Justice Black and Mr. Justice Goldberg in favor of a construction of the First Amendment that furnishes immunity for criticism of official conduct of a public official and their criticism of the majority opinion for, instead, adopting a malice standard, are very similar to the arguments that defendants make in this case. Even though it is generally recognized that state libel laws, even with the *New York Times v. Sullivan* limitations, discourage the media from good faith criticism of public officials, the courts have not moved in the direction of providing the absolute immunity that defendants propose in this litigation. See *Harte-Hanks Communications Inc. v. Connaughton,* 109 S.Ct. 2678, 2696 (1989). ("We have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail.") See Lewis, *New York Times v. Sullivan Reconsidered: Time to Return to "The Central Meaning of the First Amendment," supra,* for an explanation as to why the *New York Times* standards have not provided adequate protection for political speech. Also see Richard A. Epstein, *Was New York Times v. Sullivan Wrong?,* 53 U.Chi.L.Rev. 782, 802 (1986) ("It is doubtful, however, that the total situation is improved by the adoption of the actual malice rule.").

In the *New York Times v. Sullivan* line of cases, the Supreme Court balanced the First Amendment protec-

tions with the purposes of state libel laws in a way that provided increased protection to the press while preserving the underlying purposes of state libel laws. There is not an equivalent balancing for anonymous Internet speech. If the First Amendment does not permit a plaintiff who is a public figure from learning the identity of the publisher, state libel actions will not be available to discourage anonymous publishers from publishing statements known to be false and made for the purpose of injuring or harming a public official's reputation and/or exposing the public official to public hatred, contempt, and ridicule. Alternatively, once the public official has met the thresholds that I have established, the Internet speaker will lose his or her anonymity even though a jury may ultimately find that (1) the statements were true (or otherwise made in good faith) or (2) the harm rises only to a level of public embarrassment or annoyance.

In choosing between these two alternatives, I must recognize state tort law because there is no case law which would suggest that the First Amendment leaves the states without any meaningful tort law to discourage the publication of defamatory statements concerning public officials.[12]

---

12. Defendants do not present any arguments based on the Pennsylvania Constitution. Under Article I, Section 7 of the Pennsylvania Constitution, there may be no conviction for the publication of papers relating to the official conduct of officers or persons in public capacity or to any other matters proper for public investigation where it is established that such publication was not maliciously or negligently made. There does not appear to be any case law construing the Pennsylvania Constitution that would protect a speaker's anonymity with respect to an allegedly defamatory statement concerning a public official.

First Amendment anonymity claims have been raised in libel litigation against the press. There is an established line of cases that has required disclosure of the sources of the criticism of a public figure where necessary for a public figure to pursue a libel action. The issue has arisen where the public official brings a defamation action against the publisher. The publisher defends on the grounds of truth and/or good faith. The public official seeks the publisher's alleged sources to meet his or her burden of proving actual malice. The argument of the press is that the free flow of news obtainable only from anonymous sources is likely to be deterred absent complete confidentiality.

This argument was rejected by the United States Supreme Court in *Branzburg v. Hayes,* 92 S.Ct. 2646 (1972), where the court held that a reporter does not possess a First Amendment privilege to refuse to answer relevant and material questions asked during a grand jury investigation instituted and conducted in good faith. The plurality opinion stated that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 2657. However, the plurality opinion also recognized that "news gathering is not without its First Amendment protections" (*id.* at

---

Pennsylvania has a shield law (42 Pa.C.S. §5942(a)) which provides that no person employed by a newspaper of general circulation shall be required to disclose the source of information in any legal proceeding, trial, or investigation before any government unit. However, there is no legislation providing any protection for Internet publications.

2670); only where there is a substantial relation between the information sought and a subject of overriding and compelling state interests must the First Amendment give way to the duty of any citizen to give testimony relevant to an investigation into the commission of a crime. In a separate concurring opinion needed to make a majority, Mr. Justice Powell emphasized the limited nature of the court's holding stating that: "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.* at 2671 (Powell, J. concurring). (footnote omitted)

Following *Branzburg*, almost all federal courts of appeals have recognized a qualified privilege rooted in the First Amendment against compelled disclosure of anonymous sources in civil libel cases. However, this qualified privilege which they have recognized does not outweigh the states' interest in protecting the reputations of its citizens. Within eight years of the *Branzburg* decision, four federal courts of appeals—*Cervantes v. Time Inc.,* 464 F.2d 986 (8th Cir. 1972); *Carey v. Hume,* 492 F.2d 631 (D.C. Cir. 1974); *Miller v. Transamerican Press Inc.,* 621 F.2d 721 (5th Cir. 1980), *supplemented by* 628 F.2d 932 (5th Cir. 1980), and *Bruno & Stillman Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980)— had considered a plaintiff's request to compel a publisher to reveal sources in a libel action against this publisher.

In *Cervantes,* the court held that the First Amendment barred compulsory disclosure unless "there is a concrete demonstration that the identity of the defense news sources will lead to persuasive evidence on the issue of malice." 464 F.2d at 994. In *Carey* and *Miller,* the courts adopted the constitutional balance which the Second Circuit used in *Garland v. Torre,* 259 F.2d 545 (2d Cir. 1958), a civil defamation action involving a court order compelling the defendant reporter to disclose her sources. This balance, according to the *Carey* court, "essentially is that the court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired." 492 F.2d at 636. (footnote omitted) In weighing the respective interests of the parties, the critical factors are whether the information sought appears to go to the heart of the libel action, whether the identity of the source is critical to the plaintiff's claim, and whether the claim appears to be substantial.

Where the claim has substance and the identity of the source is critical, the *Carey* and *Miller* courts held that the First Amendment interests must give way to the paramount public interest in the fair administration of justice. In *Bruno & Stillman Inc.,* the court held that First Amendment considerations required that Rule 26 of the Federal Rules of Civil Procedure (general provisions governing discovery) be construed to bar discovery of confidential sources in the absence of a finding that the plaintiff's need for the information outweighs the defendant's need to preserve confidentiality.

During this same period, three other federal courts of appeals considered requests of a party to a civil action to compel a nonparty witness to disclose confidential sources. In *Baker v. F&F Investment,* 470 F.2d 778 (2d Cir. 1972), the court upheld the lower court's denial of the motion to compel disclosure because there were other available sources of information that might have disclosed the identity of the confidential source which the moving party had not exhausted. Also, the true identity of the confidential source did not go to the heart of the plaintiffs' case. According to the court, the balance between the private interest in compelling disclosure and the public interest in nondisclosure of confidential sources, which was properly struck in *Garland,* bars disclosure in the absence of a "compelling" or "paramount" state interest. Consequently, it shall not be required where the moving party has not demonstrated that the identity of the confidential source "is necessary, much less critical, to the maintenance of their civil rights action." *Id.* at 784.

In *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977), the court held that First Amendment considerations outweigh the need for disclosure in the absence of a paramount interest favoring disclosure. The court discussed the criteria that it found that the *Garland* case had adopted: whether the party seeking information independently attempted to obtain this information elsewhere and has been unsuccessful; whether this information goes to the heart of the matter; whether the information is of certain relevance; and the type of controversy. It noted that the *Baker* case was more protective of the

First Amendment because information of questionable relevance weighed in favor of protection. The court also discussed *Cervantes* and *Carey* before remanding to the lower court to develop a record so that these various factors announced in these cases could be weighed. *Id.* at 438.

In *Riley v. City of Chester,* 612 F.2d 708 (3d Cir. 1979), the court held that the standard of need required before the qualified privilege rooted in the First Amendment may be set aside is a strong showing by those seeking to elicit the information that there is no other source for the information requested and that the material sought will provide a source of critical information going to the heart of the claim.

Later cases follow the legal principles enunciated in these opinions. In 1993, in *Shoen v. Shoen,* 5 F.3d 1289 (9th Cir. 1993), the Court of Appeals for the Ninth Circuit summarized the law as follows:

"However, when facts acquired by a journalist in the course of gathering the news become the target of discovery, a qualified privilege against compelled disclosure comes into play. In *Farr v. Pitchess,* 522 F.2d 464, 467-68 (9th Cir. 1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), we interpreted *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), as establishing such a qualified privilege for journalists. Eight of the other nine circuits that have decided the question read *Branzburg* the same way.

"Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the

free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'

"We held in *Farr* that the journalist's privilege recognized in *Branzburg* was a 'partial First Amendment shield' that protects journalists against compelled disclosure in all judicial proceedings, civil and criminal alike. *Farr,* 522 F.2d at 467. Nevertheless, we stressed that the privilege is qualified, not absolute, and held that the process of deciding whether the privilege is overcome requires that 'the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest.' " *Id.* at 468; *Shoen,* 5 F.3d at 1292-93. (footnote and citations omitted)

Within the past six months in *Ashcraft v. Conoco Inc.,* 218 F.3d 282 (4th Cir. 2000), the Court of Appeals for the Fourth Circuit described the law as follows:

"Nevertheless, the reporter's privilege recognized by the Supreme Court in *Pell [v. Procuier,* 94 S.Ct. 2800 (1974)] and *Branzburg* is not absolute and will be overcome whenever society's need for the confidential information in question outweighs the intrusion on the reporter's First Amendment interests. See *e.g., Branzburg,* 408 U.S. at 690, 708, 92 S.Ct. 2646 (holding that reporter, like ordinary citizen, must respond to grand jury subpoenas and answer questions related to criminal conduct he personally observed and wrote about, regardless of any promises of confidentiality he gave to subjects of

stories). On a motion to compel disclosure of confidential news sources, this balancing of the reporter's interests and society's interests is committed to the sound discretion of the district court. See *Church of Scientology Int'l v. Daniels,* 992 F.2d 1329, 1335 (4th Cir. 1993) (citing *LaRouche, [infra,]* 780 F.2d at 1139); see also, *Branzburg,* 408 U.S. at 710, 92 S.Ct. 2646 (reporter's claim of privilege should be judged on case-by-case basis) (Powell, J. concurring).

"In order to guide the district court in balancing these interests, in *LaRouche v. National Broadcasting Company,* 780 F.2d 1134 (4th Cir. 1986), we adopted the following three-part test: '(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information.' " *Id.* at 1139 (citing *Miller v. Transamerican Press Inc.,* 621 F.2d 721, 726 (5th Cir. 1980)); *Ashcraft,* 218 F.3d at 287.

Pennsylvania case law follows the same standard. See *Davis v. Glanton,* 705 A.2d 879 (Pa. Super. 1997), where the court stated:

"Inquirer also asserts that the trial court's order is violative of the qualified First Amendment privilege protecting members of the news media from divulging their sources, including unpublished information. See *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir. 1980); *Riley v. City of Chester,* 612 F.2d 708, 714-15 (3d Cir. 1979). This privilege, designed to protect freedom of the press by insuring a free flow of information to reporters, will be overcome only where a demonstrated, specific need for evidence presents a paramount interest to which

the privilege must yield. *Riley v. City of Chester, supra* at 715-16 (citing *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974)). The determination of whether the privilege has been over-come must be made on a case-by-case basis, balancing the rights of reporters under the First Amendment against the interests of those seeking the information the report-ers possess. *Id; McMenamin v. Tartaglione,* 139 Pa. Commw. 269, 287, 590 A.2d 802, 811 (1991). *This bal-ancing of interests will tip in favor of disclosure of infor-mation where: (1) the information sought is material, relevant and necessary; (2) there is a strong showing that it cannot be obtained by alternative means, and (3) the information is crucial to the plaintiff's case. Riley v. City of Chester, supra* at 716-17; *McMenamin v. Tartaglione, supra." Davis,* 705 A.2d at 885. (emphasis added)

Under the balancing of rights using the three factors described above, plaintiff may obtain the information which she seeks (the identity of the publisher) because this information (1) is material, relevant, and necessary, (2) it cannot be obtained by alternative means, and (3) it is crucial to plaintiff's case.[13] Defendants' contention that state libel laws give way to the First Amendment's pro-tections afforded anonymous speech cannot be recon-ciled with the use of this three-factor standard that gives

---

13. In a lawsuit against a national media defendant, it is possible for the plaintiff to recover damages without disclosure of the source. However, in a lawsuit against an anonymous Internet publisher, it is not possible for the plaintiff to recover damages without the disclo-sure of the identity of the defendant.

priority to the states' interests in making its libel laws available to public figures.

## III.B.

Defendants have proposed that anonymity be protected unless plaintiff can show out-of-pocket losses or medical treatment in order to lessen the likelihood that libel actions will be instituted solely for the purpose of discovering the identity of an anonymous critic. However, as the Pennsylvania Superior Court recognized in *Tucker v. Philadelphia Daily News, supra,* 757 A.2d at 944, citing *Agriss v. Roadway Express Inc.,* 334 Pa. Super. 295, 316, 483 A.2d 456, 467 (1984), quoting from *Gertz v. Robert Welch Inc., supra,* 94 S.Ct. 2997, the more customary types of actual injury inflicted by defamatory falsehoods include impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering. Traditionally, the purpose of civil defamation actions has been to discourage persons from making false statements for the purpose of harming another's reputation. To accomplish this purpose, the law requires only a showing of general damages. *Walker v. Grand Central Sanitation Inc.,* 430 Pa. Super. 236, 634 A.2d 237 (1993). Thus, a requirement of proof of out-of-pocket losses would alter state defamation law in a way that would undermine its essential purpose.

## III.C.

There is a final argument that has not been directly raised but appears to underlie other arguments. On a scale of seriousness of one to 100 (with one being a false state-

ment that plaintiff violated the law by failing to report a $32 reimbursement from the Mahoning County Bar Association for driving to Youngstown, Ohio, to address its annual meeting and with 100 being a false statement that Globe Consulting Inc. hired plaintiff's husband as a $500,000 per year consultant shortly after plaintiff voted to reverse a $27 million verdict against Globe Consulting Inc.), it is suggested that the statement in this lawsuit is not even a five. While an argument that anonymity should not be lost in order to permit a plaintiff to pursue a slightly more than de minimis defamation lawsuit has certain appeal, the applicability of the First Amendment cannot turn on how a judge evaluates the significance of a statement that meets state law and First Amendment requirements for pursuing a defamation action. At oral argument, defendants recognized that the arguments they were making for anonymity would need to apply regardless of whether the alleged defamatory statement involves an accusation that a judge has violated the Judicial Ethics Code by contacting the governor about filling a judicial vacancy or by deciding a case in favor of a party shortly before the party hired the judge's husband as a $500,000 per year consultant.

## IV.

While there is not any particularly satisfactory middle ground that can protect the publisher's anonymity unless and until the plaintiff establishes that (1) the statement was false, (2) malice, and (3) damages, it is possible to minimize the harm to defendants from retaliation by third parties through the use of a protective order which

provides that until further order of court discovery responses involving the identity of the publisher will be made available only to the parties and their counsel and will not be disclosed to any third party.[14] I recognize that this protection goes only so far. I do not know whether the case can be tried without the publisher's identity being revealed to persons other than the parties and their counsel.[15] Also, any ruling that does not fully protect the anonymity of the anonymous Internet speaker may deter anonymous Internet speech.

## CONCLUSION

Although there may be some dispute as to the degree of the impact, it is clear that the availability to public officials of state libel causes of action will have an impact on anonymous Internet criticism of public officials made in good faith. The impact will be present unless the First Amendment, either directly (by providing absolute immunity) or indirectly (by making it impossible

---

14. In *Star Editorial Inc. v. United States District Court for the Central District of California,* 7 F.3d 856 (9th Cir. 1993), the court of appeals, in discussing the importance of protecting confidentiality, referred to the district court's recognition of "the importance of protecting confidentiality to prevent the risk of job loss to the informants and tailored its order to protect the sources by restricting disclosure to counsel and only for the purposes of this litigation." *Id.* at 861. Also see *Bruno & Stillman Inc. v. Globe Newspaper Company,* 633 F.2d 583, 598 (1st Cir. 1980) ("[a]nother recourse might be a deposition with limited attendance and with dissemination proscribed to others than counsel").

15. Identities will be revealed if plaintiff prevails because the constitution does not protect speech that has been found to be defamatory.

to learn the identity of the publisher) bars the states from allowing public officials to bring libel actions against anonymous Internet publishers. The case law's preservation of civil libel actions for criticism of public officials in the performance of their public duties precludes the interpretation of the First Amendment that defendants propose.

For these reasons I enter the following order of court:

## ORDER

On November 15, 2000, it is ordered that:

(1) except as provided for in paragraph (2), defendants' motion for a protective order is denied; and

(2) discovery related to the identity of the defendants shall be subject to a confidentiality order, which the parties shall prepare, consistent with the opinion which accompanies this court order.